Rel: September 27, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2024

_____

### CL-2023-0382

_____

### Catherine S. Cauthen

### v.

### Carey Lee Cauthen, Jr.

_____

### CL-2023-0408

_____

### Carey Lee Cauthen, Jr.

### v.

### Catherine S. Cauthen

### Appeals from Baldwin Circuit Court
### (DR-19-901487)

On Application for Rehearing

FRIDY, Judge.

The opinion of July 26, 2024, is withdrawn and the following is substituted therefore.

Catherine S. Cauthen ("the wife") appeals from a judgment of the Baldwin Circuit Court ("the trial court") divorcing her from Carey Lee Cauthen, Jr. ("the husband"), and, among other things, dividing the marital assets, calculating child support, and finding her in contempt for violating a status quo order. The husband cross appeals, challenging the trial court's computation of his share of the value of a pickup truck, its failure to hold the wife in contempt for failing to pay a certain bill and for causing him to incur living expenses because of her violation of the status quo order, and its failure to award him an attorney fee. For the reasons set forth herein, we affirm the judgment in part, reverse it in part, and remand the cause to the trial court.

## Background

The parties married in July 2013 and had one child ("the child"), who was born in 2016. On December 11, 2019, the wife filed a divorce action against the husband alleging incompatibility of temperament. On

December 12, 2019, the trial court entered an order directing the parties to maintain the status quo as it existed during the marriage to the extent possible. To assist in the achievement of that goal, the order directed the parties to pay debts and recurring monthly financial obligations such as rent, utilities, groceries, and the like "in the same manner and from the same sources as they have customarily been paid during the marriage." The status quo order also directed the parties to preserve assets, providing:

> "Apart from reasonable and necessary expenditures of funds in order to pay the regular recurring expenses of the parties, without PRIOR permission of the Court, the parties SHALL NOT: (1) dissipate, encumber, sell, transfer, conceal, destroy, or dispose of assets presently in their control, nor shall they permit the same to occur; (2) make withdrawals from or liquidate any account with a financial institution including but not limited to checking, savings, money markets, or CDs; (3) incur any debt; (4) withdraw from, borrow against, alter or change the beneficiary designation of or reduce in any way any retirement type account including but not limited to profit-sharing, pension, IRA, or Keogh; (5) alter or change any insurance policy (medical, life, property, etc.) including making changes to the ownership, beneficiary designation, term, or amount, and further shall not allow any policy to lapse or the coverage to be otherwise adversely affected; (6) terminate or adversely affect any utility service, including water, gas, electric, cable, internet, telephone or other services, or withdraw deposits therefrom; (7) expend any funds for vacations or luxury items; (8) sign or endorse the other party's name to or negotiate any negotiable instrument or legal document (such as tax returns, tax refunds, insurance

payments, loans, credit card applications); (9) terminate or limit credit cards unless in that party's sole name; (10) open or divert mail addressed to the other party; (11) destroy or alter any records of any kind, including electronic data files."

On March 31, 2020, the husband answered the wife's complaint with a general denial. Through different counsel, the husband filed an amended answer and a counterclaim for divorce on April 29, 2020. That same day, he filed a motion requesting custody of the child and exclusive possession of the marital residence. In that motion, he alleged that the wife had "become increasingly unstable, erratic, and violent" toward him and that her behavior had "spiraled out of control," including, he said, drinking alcohol to excess. The husband further alleged that the wife had threatened to kill him and others, had threatened to commit suicide, and had access to firearms. The trial court scheduled a hearing on the husband's motion for May 4, 2020.

On May 4, 2020, shortly before the scheduled hearing, the wife filed a response to the husband's motion alleging that, although they were then living in separate rooms of the marital residence, the husband "caused her to suffer inappropriate touching almost every morning" and that he had raped her on at least two occasions. In her response, she claimed she had not disclosed the alleged rapes earlier because, she said,

4

she was a "private person and simply did not [want] anyone to know about the situation in her home." The wife denied the behavior the husband had attributed to her, stated that he drank alcohol to excess, and claimed that he was "actually very lazy and is telling mistruths in an effort to obtain money from [her] family as he refused to properly and adequately provide for [the] wife and child." She asked that the husband be required to vacate the marital residence and that she be allowed to retain custody of the child.

The trial court held the hearing on May 4 as scheduled. On that date, the trial court entered an order requiring that, because of the allegations of domestic violence, guns in the marital residence, and excessive use of alcohol by both parties, the Department of Human Resources ("DHR") was to conduct a home study and report its findings to the court.

The trial court held the trial over three days on August 2 and 6, 2021, and November 23, 2021. The wife and the husband both testified that when they married in 2013, her father had given them a choice between having a large wedding or having a smaller wedding and receiving a gift of $40,000. They chose to take the money, and the

ceremony was held before immediate family only. The wife's father, however, testified that he did not give them any money at the time of the wedding but, instead, had merely lent them the $40,000 to help them get started in life; he had nothing to document that the payment was a loan.

When they first married, the husband and the wife lived in Montgomery. After about four months, they moved to Dalhart, Texas. In Dalhart, the husband worked in the cattle industry; the wife worked for veterinarians making "farm calls" before going to work in a research program in a diagnostic laboratory. The husband testified that, at that time, his annual income was between $40,000 and $45,000 and the wife earned between $50,000 and $55,000. The wife testified that her parents lent them the money to purchase their first house. Because that house was built over a sewer line, the wife said, they were forced to sell it without a profit. She said she repaid her parents, who then gave her a second loan to purchase the second home she and the husband had in Dalhart. The wife said she and the husband bought the second house for approximately $161,000 and that she paid her father $500 each month. The wife testified that the second house needed numerous repairs, most

of which she made herself, and that she paid a handyman to do the work that she could not handle.

The child was born in September 2016. The wife said that, when the parties lived in Texas, the husband paid for half of the child's daycare expenses but that, at that time, she provided health insurance for the family. She also said that, when she and the husband lived in Texas, he "was never really around" because, she said, he was "roping," drinking with his friends, or "hanging out with other women." She said that he came home "enough to make it look good."

The husband and the wife sold the second house in December 2017 for $165,718.18. The wife said that she could not remember how much of that amount she gave to her father but that she knew she paid him back with interest. After selling the second house, the parties remained in Texas for a few months before they returned to Alabama. The wife testified that she wanted to live closer to her family in Alabama because her grandfather was ill and because she wanted to divorce the husband. She also said that her parents were eager for the wife, the husband, and the child to return to Alabama. The husband testified that he and the wife wanted to return to Alabama to start a cattle business on her

family's land. The wife and the husband testified that the wife's mother had said that she would keep the child and pay for daycare while the mother worked.

The wife said that the husband left Texas in February 2018 but that she and the child stayed until the end of March so that she could receive a bonus at work. The husband returned to Montgomery, where he worked at a stockyard for a man he had known for a long time and with whom he had discussed "running some cattle" on the wife's family's land. The wife said that the husband and she had hoped to run cattle on her grandparents' property when she inherited that property until, she said, she saw the husband's business plan. She did not elaborate on that comment.

In March 2018, the wife and the child moved to Fairhope from Texas and lived in a house ("the Fairhope house") her parents had purchased. The wife said that her father offered to let them live in the house rent-free. Her parents also initially paid the utilities at the Fairhope house, the wife said.

The wife testified that she did not know why the husband went to Montgomery rather than Fairhope, where she and the child were living,

8

other than to say that he was supposed to obtain a job that provided family health insurance. The wife testified that the husband's job at the stockyard did not provide health insurance, but, she acknowledged, the husband did begin providing the wife and the child with insurance within a few months of starting work there.

The husband testified that, while he worked in Montgomery, he traveled to Fairhope once or twice a week and almost every weekend that he did not have to work. Other weekends, he said, the wife and the child would come to Montgomery. The wife corroborated his testimony.

The husband testified that the wife and he had a happy marriage and that, while they were living apart, they called each other daily. He submitted text messages in which they used numerous terms of endearment for each other. The texts tended to show that they had what the husband said was a loving relationship in which they shared their lives, including purchasing furniture together, looking at property together, and doing routine things like buying groceries for the family. The wife acknowledged that, when she and the husband returned to Alabama, they would text each other about looking forward to spending

9

weekends together and about how much they loved each other. The husband joined the wife in Fairhope in December 2018.

The wife testified that, throughout the marriage, she and the husband maintained separate financial identities. She said that they never had a joint financial account. She said that she had a checking account ("the checking account") that she opened before the parties married and a money-market savings account ("the savings account"). When the wife left Texas after receiving her bonus and after repaying the loan from her parents that they had used to purchase the second house in Texas, the checking account and the savings account had a combined balance of $101,666.06. The record does not disclose the original source or sources of the money in those accounts.

A review of transactions involving the checking account indicated that the husband transferred money into that account but that he did not deposit his entire paycheck into that account. The husband testified that he considered his income during the marriage to be "marital funds." He testified that, in 2018, he transferred $12,845.23 into the checking and savings accounts in the wife's name. In 2019, he said, he transferred only $5,561.99 into the wife's accounts but, that year, he said, he was also

paying more than $800 per month for health insurance for the wife and the child. Additionally, he said, he would purchase groceries and paid expenses incurred for the care and feeding of the wife's horses.

The wife said that she had full access to the husband's bank account and that she would transfer money from the husband's bank account into the checking account to pay the household bills. She said she also set up an automatic payment from his bank account to pay credit-card debt. At times, the wife said, she would send the husband a text message with the amount of money she needed for the bills, and, she said, he would transfer that amount to the checking account "after [she] produced a list of documentation of what he was paying, cent for cent."

The wife referred to the husband's transfers of money into the checking account as "reimbursements" for his share of the expenses and said that he never put money into the account other than for those "reimbursements." She said that she divided the household expenses the "same as I did with all my roommates in college." For example, she said that the husband provided money for his share of the utilities and, she said, "[i]f he wanted TV, he had to pay for it because [she] thought it was a waste of money."

11

A review of the savings account indicated that the wife deposited the bonus she received before leaving Texas into that account. She said that she would transfer money from the savings account into the checking account to pay for things.

In November or December of 2018, the wife said, she met John Ikner and in early 2019, the two began to communicate by phone regularly. She began working for his company, John Ikner Homes, Inc., at that time, and she admitted that the two began a sexual relationship before she filed her divorce complaint in December 2019. At the time of the trial, she continued to work as an independent contractor for Ikner's construction company.

After the husband moved to Fairhope in December 2018, the wife testified, there were "many, many nights" that she failed to come home. The husband said that the first night she did not come home was December 23, 2018. She returned to the Fairhope house the evening of December 24, 2018. She acknowledged that the husband was home with the child the nights she did not come home. She also admitted that she came home one morning with a bumper hanging off her truck and, on another occasion, she came home with vomit on the side of her vehicle.

The wife said that one night, she left the house by climbing out of the bedroom window.

The husband testified that there were several nights when the wife came home "highly intoxicated," to the extent that the child recognized that something was wrong. Some nights, he said, the wife left the house with guns from their gun safe. When asked whether she had taken a gun from the gun safe, waved it around, and left the marital residence on many occasions, the wife replied, "Not on many occasions, no." She said that she had a pistol, three shotguns, and multiple rifles. She testified that she had threatened to kill herself if the husband would not let her out of the marriage. The husband corroborated the wife's testimony, adding that, sometimes when the wife had been drinking, she had threatened to kill other people. The husband said that, at his request, he and the wife sought counseling but that it did not work.

The husband testified that he told the wife's mother that he was concerned about the wife's drinking. He also said that he had talked to the wife's mother several times about her possibly coming to the Fairhope house to stay with the child on days he had to go to work early and the wife had not come home from the night before. He said the wife's mother

13

told him that she was worried about the wife, as well, and that she believed that the wife needed help because of her drinking. To corroborate his testimony regarding his conversations with the wife's mother, the husband submitted a text message she had sent to him informing him that the wife had been drinking again and was leaving the house.

The wife testified that the husband had had unwanted sexual contact with her in early 2019, then said it occurred in early 2020, after she had filed the divorce complaint. We note that, in her testimony, the wife never said that the husband had raped her, as she had alleged in her response to the husband's motion for custody and for exclusive possession of the marital residence.

The husband disputed the wife's characterization of his conduct. He related an incident that occurred one Friday night in April 2019, when he had planned to take the wife out to dinner and arranged for the wife's mother to stay with the child. The wife did not come home until after nine, the husband said, and told him that she did not want to go out to eat. He said that he could tell that she had been drinking. The wife told the husband that she wanted a divorce, and they talked for "quite some

time." He said he told the wife that he was willing to do anything he could, adding that he was trying to save their marriage. Eventually, the husband and the wife went to sleep, and, he said, he began touching her to try to make up with her. He said that, in doing so, he may have touched her crotch but that they did not engage in sexual relations. The wife jumped up, he said, and he got the keys to her truck because he believed that she was leaving. He said that the wife demanded the keys, and when he did not give them to her, she hit him and then went to the guest room, opened the gun safe, and began removing guns and putting them on the bed. The husband said he pleaded with her to stay and told her that he would sleep on the couch. He said that she told him that if he did not give her the keys, she would call the police and report that he was threatening her with the guns. He said he gave her the keys, and she left. Telephone records that the husband submitted into evidence indicate that, when the wife left the house, she called John Ikner. The records indicate that, in April 2019, the month in which the described incident occurred, the wife spoke with Ikner 118 times.

In April 2020, after the wife had filed the divorce complaint, she called the husband to tell him she needed to get money out of their gun

15

safe, where they also kept cash, to pay a worker $800. However, she said, she took two envelopes of cash containing a total of approximately $15,000 and left $600 for the husband. The husband confirmed the wife's testimony, adding that she also removed several guns from the safe.

The wife's father testified that he was surprised to learn that the wife had filed a divorce action and was also surprised about some of the wife's behavior that the husband related to him. He said he had a conversation with the wife and then told the husband that if they could not get along, the husband should move out of the marital residence.

As mentioned, on May 4, 2020, the trial court heard the parties' competing motions for possession of their house in Fairhope and for temporary custody of the child. At the hearing, the trial court ordered DHR to investigate the parties before it ruled on the motions. The next day, May 5, 2020, the husband and the wife were served with an eviction notice. According to the notice, the wife's parents had decided to sell the Fairhope house "to reallocate funds that [were] needed elsewhere" and a long-term rental of the Fairhope house was "contrary to the best use of the property by the owner." The notice indicated that the husband and the wife were to vacate the house no later than June 4, 2020.

The wife testified that, upon receiving the eviction notice, the husband looked for storage units where the parties could move their personal property, including their home furnishings, and notified the wife of the cost of those units. The wife said that, although she did not remember specifically saying so, she probably told the husband that if he moved anything out of the house, she would have him arrested for theft. On June 4, 2020, the wife's parents issued a second notice permitting a two-week extension of the lease "for personal property only." The notice expressly provided that the wife's parents did not intend to allow the husband to continue to live in the Fairhope house. The wife's father testified that he and the wife's mother believed that the husband needed to be out of the house.

The wife did not move from the Fairhope house, and she acknowledged that by not allowing the husband to remove anything from the Fairhope house while she continued to live there, she retained all the marital property. Meanwhile, the husband had to find a new place to live and furnish that residence. He testified that he rented a house in Fairhope. He could not get any furniture or other items from the marital

17

residence, he said, and he even had to buy socks and a toothbrush the day he left that house to be able to go to work the next day.

On July 1, 2020, the wife signed a new lease agreement with her parents allowing her to live in the Fairhope house until June 1, 2021. The rent was to be $2,300 per month, and the wife had to pay a security deposit of $2,300. In addition, the wife was required to pay back rent from May 2018, and, on July 1, 2020, the wife wrote a check to her parents for $85,100. The wife's father testified that he was not aware, until the wife filed for a divorce, that the husband and the wife had not been paying rent for the Fairhope house, but he acknowledged that he had never discussed rent with the husband. He said he did not like taking $85,100 for back rent but said that he felt like the husband and the wife needed to pay it. The wife also paid her parents an additional $360 to store her personal property in the Fairhope house from June through December 2020, even though she was living in the house at that time. She said she paid that amount out of the checking account.

The wife testified that her mother signed the contracts for the child's daycare and paid the child's daycare expenses of $185 per week from May 2018 until June 29, 2020, for a total of $14,696. The wife

18

testified that, after she filed the divorce complaint, she repaid her mother the $14,696 for the daycare expenses with money from the checking account. The wife also used money from the checking account to "reimburse" her parents $4,398 for power and water bills that they had paid while the husband and the wife lived in the Fairhope house. The husband testified that, in all, the wife "depleted" a total of $144,545 from what he said should be marital funds by paying "reimbursements" to her parents.

Other than the two houses they purchased in Texas, the wife said, the parties did not jointly purchase any other real estate during the marriage. At the time of the trial, the wife said, she owned forty acres of land ("the Higbee farm property") that had been a gift to her from her grandfather, Dick Higbee, in 2006 or 2008, before the parties had married. She testified that her grandfather had allowed another man to farm the Higbee farm property and that that man was still farming that property at the time of the trial. Before the marriage, the wife also inherited a half-interest in a condominium in Auburn, which she sold during the marriage. The wife said that her grandparents also "gifted"

her a quarter-interest in a beach condominium, which was sold in 2020, after she had filed the divorce action.

The husband testified that, other than the real property that the wife had been gifted, the parties did not own any real property. However, he said, the wife paid the taxes on the condominiums and the Higbee farm property, as well as other fees and purchases associated with those properties, from the account from which the household bills were paid and to which he contributed money.

The husband testified about a dispute regarding the payment of the parties' bill for cellular telephone service through Verizon ("the Verizon account") that arose while the divorce was pending. He said that, in addition to his line and the wife's line, the wife had added lines for her mother and her grandmother, and the total bill was paid automatically through one of the wife's credit cards. In April 2020, the husband said, he was notified that three lines had been removed from the Verizon account, so that his was the only line remaining, and that the automatic payment through the wife's credit card had been deleted. As a result, he said, he linked his credit card to the Verizon account. About a month later, he said, he was notified that the three lines had been re-added to

20

the Verizon account. The husband said that the wife's cancellation of the payment method for the Verizon account, leaving him to pay the monthly bill, constituted a violation of the status quo order. At trial and in his postjudgment motion, the husband argued that the trial court should have required the wife to reimburse him for an equitable portion of the Verizon bill.

The wife testified that in April 2020, again while the divorce was pending, she purchased two lots in Magnolia Springs ("the Magnolia Springs property"). The wife said that the transaction was "in the works" before she filed for the divorce in December 2019 and that she did not ask the court for permission to purchase real property even though the status quo order was in place when the closing occurred. To buy the Magnolia Springs property, the wife said, she obtained a $130,000 loan from her father, who also gave her an option to receive an additional $20,000 to make improvements to the Magnolia Springs property. One of the lots had a structure on it, which Ikner's company removed. The security and collateral for the loan was the Magnolia Springs property; the wife's father also took a 2019 model Chevrolet 2500 pickup truck that was in the wife's name ("the wife's pickup truck") as additional collateral. The

21

wife's pickup truck had been purchased during the marriage, and the husband testified that he had often driven it during the marriage.

The wife's father testified that, by the time of the trial, no payments had been made toward the $130,000 loan and that he had taken ownership of the wife's pickup truck. The title and the insurance to that truck were both in his name, he said. The husband testified, however, that, after the wife's father's testimony, the husband paid to have a title search performed on the truck, and it was still in the wife's name. The wife's father also testified that he believed that the title to the Magnolia Springs property reverted to him because of the wife's failure to repay the loan. The wife's father said that he believed that the Magnolia Springs property was worth between $130,000 and $140,000, but, even though the property was worth at least as much as the loan, he still was entitled to take ownership of the wife's pickup truck because, he said, there had been some demolition expenses when the structure on one of the lots was removed. He then admitted that the wife had paid those expenses.

When the wife received the $130,000 loan from her father, she signed a promissory note and received a payment schedule. She testified

22

that she had not made any payments toward the loan and that she had not exercised her option for money with which to make improvements. The wife admitted that taking out the loan and creating an encumbrance on her pickup truck appeared to be violations of the status quo order. Evidence was presented indicating that, in January 2020, the month after the wife received the loan from her father, a payment of $10,000 was made toward the wife's pickup truck from the checking account and the savings account, but the wife said that she did not recall making that payment. The wife said that paying $10,000 toward her pickup truck was not part of her usual monthly recurring expenses, but, she said, she did like to pay off vehicles early. At the time of the trial, no debt remained on the wife's pickup truck.

In December 2020, the wife received a semi-annual $10,500 lease payment from TMPA, Inc., for a cell tower on the Higbee farm property. She deposited that money into the checking account. The husband testified that the lease agreement for the cell tower was signed in November 2019 and was for a term of forty-five years.

On January 3, 2021, again while the divorce was pending, the wife purchased a 2017 Lexus automobile with a $5,000 down payment taken

23

from the checking account. She said that the month before, she transferred $4,000 from the savings account to the checking account because, she said, she needed it. In March 2021, while the divorce was pending, the wife opened what she called the Higbee Farms checking account ("the Higbee Farms account"), which had approximately $20,000 in it at the time of the trial. The wife said she made an initial deposit of $20,000 into the Higbee Farms account using money from the checking account.

The wife testified that she lived in the Fairhope house for a full year before moving in with her parents. She said she stayed with them for a few weeks before moving into a house on Higbee Road ("the Higbee Road house"), which her grandmother owned but that was empty. In 2021, the wife wrote a series of checks from the checking account to pay for repairs to the Higbee Road house, for cleaning the furniture she took to that house, for an interior designer, and, after a hurricane, for repairs to the fence around a pasture on her parents' property, where she kept her horses. The checks totaled $35,235.76.

The husband testified that, at the time of the trial, he worked for an engineering firm and, through November 2021, had earned $57,418

24

for the year. The father's testimony and a pay stub from November 21, 2021, that he submitted into evidence indicate that he paid $428.27 every two weeks for health- and dental-insurance coverage for the wife and the child, or $927.92 per month.[1] He testified that his employer paid for his health and dental insurance. The wife testified that the husband had paid for health insurance for the child and her but that, at the time of the trial, she provided her own health insurance because, she said, she did not want to be on his policy. The wife did not indicate whether she paid for the child's health-insurance coverage, and she did not provide

---

[1]In his application for rehearing, the husband wrote that this court had misstated the total amount he paid for health and dental insurance coverage as $856.54, saying that there was no evidence in the record to support that figure. We determined that amount based on the father's testimony that he paid $381.27 twice per month, or $762.54 per month, for health insurance for the wife and the child, and $47 twice per month, or $94 per month, for dental insurance for the wife and the child, for a total of $856.54 per month. This is the same amount derived from figures the father used in his original appellate brief, in which he stated that the father paid "$428.27 twice a month for medical and dental insurance covering" only the wife and the child, which is a total of $856.54 per month. Other evidence and testimony indicated that the father paid that amount every other week rather than twice per month. Paying every other week would result in twenty-six payments rather than the twenty-four payments that would result if the father paid for the coverage twice per month. The trial court based its calculation of the father's health-care-coverage costs by determining that he was paid every other week, a determination that was clearly supported by one interpretation of the evidence presented.

25

evidence of the cost of the insurance coverage she claimed she had obtained for herself. The husband also testified that he had reviewed the wife's bank records and determined from her deposits that her annual income from various sources in 2019 had been $53,022.20.

The husband presented evidence indicating that, since the filing of the divorce complaint and the entry of the status quo order, the wife had spent $39,387 on renovations to the Higbee Road house. Additionally, he submitted documentary evidence indicating that the wife transferred $16,000 from the child's savings account to the wife's checking account and an additional $7,000 from the Higbee Farms account to the checking account. In all, the husband submitted documentary evidence indicating that, since filing the divorce complaint, the wife had made what he called "suspect transactions" totaling $62,000 that he said should have remained in the checking and savings accounts in light of the status quo order.

On December 29, 2021, the trial court entered an order divorcing the parties but retaining jurisdiction over "post-nuptial" issues including the division of marital property and child custody. On January 6, 2023, the trial court entered the final judgment of divorce. In that judgment

the trial court awarded the parties joint legal and physical custody of the child and ordered the wife to pay the husband $142 per month in child support, retroactive to January 2022. The retroactivity of the child-support award created an arrearage of $1,846, which the trial court ordered the wife to pay the husband immediately. The trial court also made the following factual findings and awards:

> "Testimony was provided by the wife and other witnesses related to funds, transfers and property transfers that was not only less than credible but appeared to be actually fabricated for this litigation for the express purpose of moving those assets out of the wife's or the marital estate. Specifically, the Court finds that the lease payments on the parties' home, the reimbursement for a wedding gift, loan repayments, payment after the fact for childcare, auto transfers, and charging the parties to store their furniture were all transactions that were manipulated to circumvent this Court's ability to rule on pending matters related to possession of the home and on final matters related to property division. The wife's choice to dispose of marital assets violates this Court's Status Quo Order and for that, the Court finds the mother in contempt of Court. She is herein ordered to compensate the husband for the value of those payments and marital assets, as is addressed in the Court's award, to-wit:

>> "a. [The husband] is to receive 50% of the value of the truck [the wife] pledged as collateral and lied about transferring to her dad. A judgment for $10,210.62 is entered in favor of [the husband] and against [the wife]. The Court arrived at this number by averaging the highest value estimates given by the parties (to-wit: $60,000 and $26,000),

27

and subtracting the payoff figure given at trial (to-wit: $22,578.77) and dividing that by two. This was the only evidence presented to the Court from which the Court could make an award. Although the [wife] or her father may have paid off the remainder of the truck balance, that would have been after the parties' separation and the court does not factor that into this calculation.

"b. [The husband] is to receive 50% of what [the wife] paid to her mother for day care. A judgment for $7,348.00 is entered in favor of [the husband] and against [the wife].

"c. [The husband] is to receive 50% of what [the wife] was [sic] paid for the power and the water. A judgment for $2,194.85 is entered in favor of [the husband] and against [the wife].

"d. [The husband] is to receive 50% of the storage fee paid to [the wife]. A judgment for $180.00 is entered in favor of [the husband] and against [the wife].

"e. [The husband] is to receive 50% of what [the wife] was [sic] paid for rent. A judgment for $42,550.00 is entered in favor of [the husband] and against [the wife].

"f. [The husband] is to receive 50% of the Lexus down payment made during the pendency of this case. A judgment for $2,500.00 is entered in favor of [the husband] and against [the wife].

"g. [The husband] is to receive 50% of the wedding gift that was misrepresented to the court as a loan. A judgment for $20,000.00 is entered in favor of [the husband] and against [the wife].

28

"h. [The husband] is to receive 50% of what [the wife] paid for renovations to Dick Higbee property and her parents' fence. A judgment for $17,617.88 is entered in favor of [the husband] and against [the wife].

"i. [The husband] is to receive 50% of what was in the safe less what he got. A judgment for $7,020.00 is entered in favor of [the husband] and against [the wife].

"j. [The husband] is to receive his horse, and pay to [the wife] a reasonable feed cost and farrier bill since separation (less any feed he purchased).

"k. [The wife is to receive the Magnolia Springs/Pecan Grove property and 100% of her grandmother's property and all liability.

"l. [The wife] is to receive her Lexus and all liability. [The husband] is to receive his automobile and all liability."

The trial court also divided the parties' firearms and directed that, if the parties could not otherwise agree, the remainder of their personal property was to be divided by taking turns choosing items from a list until all the property was divided. In addition, the trial court awarded the husband control of all the 529 college funds and savings accounts established to benefit the child and ordered the wife to reimburse any money she had removed from those accounts during the pendency of the

divorce. The trial court made each party responsible for their individual debts and for their own attorney fees.

On February 2 and February 3, 2023, the wife and the husband filed respective motions to alter, amend, or vacate the judgment. On May 5, 2023, the trial court entered an order purporting to address those motions; however, the wife's motion had been denied by operation of law on Wednesday, May 3, and the husband's had been denied by operation of law on Thursday, May 4, 2023. See Rule 59.1, Ala. R. Civ. P. Thus, the May 5, 2023, order was a nullity. See Moragne v. Moragne, 888 So. 2d 1280, 1282 (Ala. Civ. App. 2004); Ex parte Miller, 335 So. 3d 1151, 1153 (Ala. 2021). On June 1, 2023, the wife filed a notice of appeal to this court; on June 8, 2023, the husband filed a cross-appeal.

## Standard of Review

When this court reviews a divorce judgment entered after the presentation of ore tenus evidence, we presume that the trial court's factual findings are correct, and we will reverse a judgment based on those findings only if the evidence does not support the judgment so as to render it plainly and palpably wrong. Clements v. Clements, 990 So. 2d 383, 389 (Ala. Civ. App. 2007). Furthermore, "the ore tenus standard of

30

review has no application to a trial court's conclusions of law or its application of law to the facts; a trial court's ruling on a question of law carries no presumption of correctness on appeal." Ex parte J.E., 1 So. 3d 1002, 1008 (Ala. 2008) (citing Ex parte Perkins, 646 So. 2d 46, 47 (Ala. 1994)).

## Analysis

### The wife's appeal

The wife contends that, in dividing the marital property, the trial court erred by impermissibly considering what she says is her separate estate. In Nichols v. Nichols, 824 So. 2d 797, 802 (Ala. Civ. App. 2001), this court explained that, in a divorce proceeding, a spouse's "separate estate" is the real or personal property over which that spouse exercises exclusive control and from which the other spouse derives no benefit because of the marital relationship. A spouse's separate estate includes property that person owned prior to the marriage and property received by gift or inheritance during the marriage. § 30-2-51(a), Ala. Code 1975. Marital property, on the other hand, includes property the parties purchased or otherwise accumulated during their marriage. In addition, property that would otherwise qualify as one's separate estate may be

31

considered marital property if it was regularly used, or income from it was used, for the common benefit of the parties during their marriage. See § 30-2-51(a), Ala. Code 1975. The trial judge has broad discretion to determine whether such property is to be considered marital property. Nichols, 824 So. 2d at 802.

The wife argues that the trial court impermissibly considered her ownership interest in three properties she had been gifted before the marriage (which, although she does not specifically identify those parcels, appear to be the Higbee farm property, the half-interest in the condominium in Auburn, and the quarter-interest in the beach condominium) when it divided the marital property because, she says, those properties were part of her separate estate. The judgment simply does not support the wife's contention, however, because the trial court did not award any of the gifted property in its property division; thus, we find no merit to this contention.

The wife also argues that the trial court impermissibly considered her share of the proceeds that she received when the Auburn condominium and the beach condominium were sold. She placed those proceeds in her checking account. She also says that she placed in the

checking account the income she received from the lease of the Higbee farm property for the use of a cellular-telephone tower.

The wife makes the conclusory assertion that the checking account was not a joint account and, therefore, she says, the money she deposited into that account, including the proceeds from the sale of the gifted property, was not marital property. She further claims that she and the husband "were each responsible for their own expenses and debts" and, as she did at the trial, characterizes the husband's contributions to the checking account or to the payment of bills or household purchases as merely "reimbursements" for the expenses he incurred during the marriage. In other words, the wife essentially characterizes all the income and property the parties acquired during the marriage as each spouse's separate property that would not have been subject to division and, although she does not explicitly say so, she appears to assert that the parties actually had no marital property.

The wife contends that she used what she called the "separate non-marital funds" from the checking account to "repay her parents for their generous loans she received while she was unemployed." Therefore, she says, the trial court could not properly award the husband a portion of

that money because, she said, it was not used for the common benefit of the marriage and was not subject to division.

The underlying premise of the wife's argument, that is, that each party retained his or her separate estate, including bank accounts and vehicles purchased during the marriage, and that the husband merely "reimbursed" her for what she said was his share of the expenses incurred during the marriage, ignores the evidence showing that the wife's bank accounts contained funds that came from both parties, that those funds were comingled, and that those comingled funds were used to pay the common bills and debts of the parties. Therefore, the trial court reasonably could have believed that the funds in the bank accounts were marital property subject to division. Additionally, the trial court was free to reject the wife's disputed testimony that the parties' funds and bills were divided during the marriage such that each party paid for only the portion of each bill attributable to him or her, and only from money received from his or her separate labor. See Morgan v. Morgan, 183 So. 3d 945, 967 (Ala. Civ. App. 2014) (holding that a trial court is not required to believe the testimony of a party, especially when it has found portions of that testimony not to be credible).

Based on the evidence presented, we find no basis for concluding that the trial court erred in determining that the checking account and the savings account were marital property, that the husband was entitled to a share of the money that was in those accounts, and that the wife depleted those accounts after filing the complaint for divorce.

The wife also argues that the trial court improperly considered her pickup truck when it divided the marital property. In its judgment, the trial court awarded the husband half of its value. Evidence indicated that the wife's pickup truck was purchased during the marriage and that the husband had often driven it during the marriage. Like the bank accounts, the trial court reasonably could have believed from the evidence that the wife's pickup truck was also marital property subject to division, and we find no basis for reversing that determination.

In a closely related argument, the wife contends that the trial court erred in holding her in contempt for spending what she says were her separate funds. As mentioned, in its judgment, the trial court found the wife violated its status quo order when she engaged in certain transactions that the trial court said were designed to move assets out of

35

the wife's or the marital estate to prevent those assets from being subject to division as marital property.

In its judgment, the trial court did not specify whether it was holding the wife in civil contempt or in criminal contempt. In finding the wife in contempt, however, the trial court ordered her to pay the husband 50% of the value of several items of personal property to compensate the husband for the value of what it had found had been "manipulated to circumvent" the court's "ability to rule on pending matters related to possession of the home and on final matters related to property division." Rule 70A, Ala. R. Civ. P., provides that, in civil proceedings, "'[c]ivil contempt' means willful, continuing failure or refusal of any person to comply with a court's lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with."[2] Moreover, "'[t]he failure to perform an act required by the court for the benefit of an opposing party constitutes civil contempt.'" J.K.L.B. Farms, LLC v. Phillips, 975 So. 2d 1001, 1012 (Ala. Civ. App. 2007) (quoting

_____

[2]In contrast to civil contempt, the dominant purpose of a finding of criminal contempt in those situations where a party has disobeyed a court order is to punish the contemnor rather than to coerce his or her compliance with the order. See Rule 70A(a)(2)(C) and (D), Ala. R. Civ. P.

Carter v. State ex rel. Bullock Cnty., 393 So. 2d 1368, 1370 (Ala. 1981)).

"The purpose of a civil contempt proceeding is to effectuate compliance

with court orders and not to punish the contemnor." Watts v. Watts, 706

So. 2d 749, 751 (Ala. Civ. App. 1997). Because the trial court's purpose in

having the wife repay the husband for depleted accounts or the value of

certain items was to compensate him rather than to punish the wife, we

conclude that the trial court intended to hold the wife in civil contempt.

"[T]he determination of whether a party is in contempt is within

the discretion of the trial court, and, unless the record reveals an "'abuse

of that discretion or unless the judgment of the trial court is unsupported

by the evidence so as to be plainly and palpably wrong, this court will

affirm.'" Nave v. Nave, 942 So. 2d [372,] 377 [(Ala. Civ. App. 2005)]

(quoting Stack v. Stack, 646 So. 2d 51, 56 (Ala. Civ. App. 1994)).

Aside from paying for their regularly recurring expenses, the status

quo order forbade the parties from, among other things, transferring

assets, making withdrawals from or liquidating "any account with a

financial institution including but not limited to checking, savings,

money markets, or CDs"; incurring any debt; terminating or adversely

affecting any utility service, including telephone services; or expending

any money for luxury items. The plain language of the status-quo order does not differentiate between marital accounts or individual accounts. As mentioned, whether certain property is marital property is left to the discretion of the trial court; it is not up to the parties individually to make that decision. See Nichols, 824 So. 2d at 802.

Here, the trial court found that the wife's transfer of money and property from her accounts "appeared to be actually fabricated for this litigation for the express purpose of moving those assets out of the wife's or the marital estate." The evidence is undisputed that, during the pendency of the divorce action, the wife depleted the checking and savings accounts when her parents "decided" that she needed to reimburse them for back rent and child-care expenses for which they had never charged her, as well as reimbursing them for "storage fees," the utilities incurred while the parties lived in the Fairhope house, and the $40,000 the wife's father had given to the parties when they married. Additionally, during the pendency of the divorce, the wife purchased real property in Magnolia Springs with a loan from her father and for which she used her pickup truck as collateral. She did not make any repayments on that loan and said that she allowed the father to take her pickup truck,

which the parties had purchased during the marriage, and put it in his name. However, the husband presented evidence indicating that, at the time of the trial, that truck remained in the wife's name. After the entry of the status quo order, the wife also used money from the bank accounts to repair a fence at her parents' residence, to renovate the Higbee property, and to purchase a Lexus automobile.

The evidence clearly supports the trial court's determination that the wife's depletion of the checking and savings accounts for the various payments to her parents, the transfer of the wife's pickup truck to her father, the purchase of a Lexus automobile, and the payments for repairs to her parents' fence and her grandparents' property were violations of the plain language of the status quo order. Therefore, the trial court's judgment finding the wife in contempt for those transactions is due to be affirmed.

The wife next contends that the trial court incorrectly calculated the parties' incomes and their health-insurance payments for purposes of determining child support. However, in her motion to alter, amend, or vacate the judgment, the wife challenged only that portion of the child-support calculation regarding the credit the husband was to be given for

his payment of health-care insurance for the child. The wife did not raise the issue of the correctness of its calculation of her monthly adjusted gross income for purposes of determining her child-support obligation. Therefore, we will not consider the wife's contention that the trial court incorrectly calculated her monthly income when determining child support. Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992) ("This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.")

Regarding the propriety of the amount the trial court credited to the husband for his payment of health-care coverage, on the Form CS-42 that the trial court completed to calculate the parties' respective child-support obligation, the trial court gave the husband a credit of $464 for health-care-coverage costs attributable to the child. The wife argues that, pursuant to Rule 32(7)(e), Ala. R. Jud. Admin., the trial court should have divided the total amount that the husband paid for health-care coverage by three rather than two to determine the credit because, she said, there was no evidence that the husband had two separate health-care policies,

40

one for himself and one for the wife and child. Rule 32(7)(e), Ala. R. Jud. Admin., provides that health-care coverage costs

> "shall be the pro rata portion of the health-care-coverage cost attributable to the child or children who are the subject of the support order, which shall be calculated by dividing the total health-care-coverage cost actually paid by, or on behalf of, the parent ordered to provide the coverage by the total number of persons (adult and/or children) covered and then multiplying the result by the number of children who are the subject of the support order."

Based on the father's testimony and information included on his November 21, 2021, pay stub, the father paid $11,135.02 annually -- $927.92 per month -- for health- and dental-insurance coverage for the wife and the child. The father testified that his employer paid the cost of his own health- and dental-insurance coverage. Using the method of computation described in Rule 32(7)(e) for determining the portion of the total cost of health-care coverage attributable to the child, the trial court properly credited the husband with half of the total amount that he paid for that coverage, which was $464 at the time of the trial. Therefore, we affirm the judgment insofar as it calculated the wife's child-support obligation.

The wife next contends that the trial court erred in awarding the husband retroactive child support. In its March 2023 judgment, the trial

41

court made the wife's child-support obligation retroactive to January 1, 2022, and found that the wife owed the husband $1,846 in child support from January 2022 through January 2023. The mother also contends that, by her calculation, the husband owes her $5,085 in child support for the 30-month period before the trial court entered the judgment.

The wife did not raise any arguments concerning the trial court's determination that she owed the father a child-support arrearage during the trial or in her postjudgment motion. Therefore, we will not entertain them on appeal. See Andrews, 612 So. 2d at 410.

## The husband's appeal

The husband contends that, when the trial court awarded him half the value of the wife's pickup truck, it improperly computed the value of the wife's pickup truck based on the evidence presented. In its judgment, the trial court awarded the husband $10,210.62, which it had calculated was half the value of the wife's pickup truck. The trial court explained that it had determined that value by "averaging the highest value estimates given by the parties (to-wit: $60,000 and $26,000) and subtracting the payoff figure given at trial (to-wit: $22,578.77) and dividing that by two." The father argues that the trial court mistakenly

used the estimations to which he testified regarding the value of the wife's pickup truck, which was between $55,000 and $60,000, and the value of his own pickup truck, a 2016 Chevrolet 1500 ("the husband's pickup truck"), which was between $25,000 and $26,000. He said that he still owed $23,000 on his pickup truck. He says that the wife did not testify as to the value of her pickup truck, and our review of the record does not reveal that the wife offered any evidence regarding the value of her pickup truck. Indeed, in her reply brief, the wife does not dispute the figures that the husband sets forth in his argument. Instead, she argues the husband should not be permitted to recover more than the $10,210.62 the trial court awarded him for his share of the value of her pickup truck because, she says, the husband did not contribute any payments toward the truck or its maintenance. She makes no argument regarding the factual mistake upon which the husband bases his argument as to this issue.

Based on our review of the record, we agree with the husband that the evidence indicates that the trial court mistakenly calculated the value of the wife's pickup truck based on a range of values the record does not support. The only evidence regarding the value of the wife's pickup

43

truck is the range of between $55,000 and $60,000 to which the husband testified. Additionally, the evidence was undisputed that there was no debt on the wife's pickup truck at the time of the trial. Because the trial court's calculation of 50% of the value of the wife's pickup truck was based on a factual mistake, we reverse the judgment as to the award of $10,210.62 to the husband for his share of the value of that vehicle, and we remand the cause for the trial court to recalculate its award based on the evidence discussed herein.

The husband next contends that the trial court erred by failing to award him an attorney fee. Specifically, he argues that he should have been awarded an attorney fee because of the wife's conduct, including her admitted adultery and the fabrication of evidence regarding the depletion of money from the bank accounts the wife claimed were hers alone but which the trial court concluded was marital property. The latter conduct was a basis for the trial court's decision to hold the wife in contempt. Section 30-2-54, Ala. Code 1975, provides that a trial court, in its discretion, may award an attorney fee in a divorce case upon a finding of civil contempt. Rhodes v. Rhodes, 317 So. 3d 37, 46 (Ala. Civ. App. 2020). The trial court awarded the husband half of the amount it found that the

wife had depleted the bank accounts at issue "to compensate" the husband. The trial court was not required to award the husband an attorney fee on top of that compensation, and, given the evidence before it, we cannot conclude that the trial court abused its discretion in refusing to do so.

Regarding the wife's adultery, we note that, in the judgment, the trial court did not state the basis on which it divorced the parties. A trial court is granted broad discretion regarding whether to award an attorney fee in domestic relations cases. See Turney v. Turney, 381 So. 3d 429, 443 (Ala. Civ. App. 2022). "Factors to be considered by the trial court when awarding such fees include the financial circumstances of the parties, the parties' conduct, the results of the litigation, and, where appropriate, the trial court's knowledge and experience as to the value of the services performed by the attorney." Figures v. Figures, 624 So. 2d 188, 191 (Ala. Civ. App. 1993). "This court will not reverse the trial court's discretionary decisions unless we are convinced that it committed a clear or palpable error, without the correction of which manifest injustice will be done." Turney, 381 So. 3d at 443 (internal citations omitted). The evidence indicated that, at the time of the trial, the incomes of the husband and

the wife were essentially equal, with both earning between $50,000 and $60,000 annually. The trial court's division of marital property was also essentially equal. We cannot say that the trial court's decision not to award the husband an attorney fee results in a manifest injustice under the circumstances. Therefore, the judgment is due to be affirmed as to this issue.

The husband next contends that the trial court erred by failing to hold the wife in contempt for her refusal to pay the Verizon cellular-telephone bill. Specifically, he argues that, after the trial court entered the status quo order, the wife removed her line, her mother's line, and her grandmother's line from the Verizon account and stopped paying the Verizon bill by means of automatic payments to her credit card. Then, after the husband began paying the Verizon bill by means of automatic payments from his credit card, she restored those lines to the Verizon account, causing him to have to pay for those lines. The wife's conduct, he argues, caused him to incur $3,487.11 in expenses that he was not paying before the entry of the status quo order. In support of his contention, the husband cites <u>Reed v. Dyas</u>, 28 So. 3d 6 (Ala. Civ. App. 2009), in which this court reversed a judgment denying a wife's motion

for contempt that she filed when the husband stopped making payments on vehicles after being ordered to do so in the parties' divorce judgment. In <u>Reed</u>, we quoted <u>J.K.L.B. Farms, LLC v. Phillips</u>, 975 So. 2d 1001, 1012 (Ala. Civ. App. 2007), for the proposition that "'[t]he failure to perform an act required by the court for the benefit of an opposing party constitutes civil contempt.' <u>Carter v. State ex rel. Bullock County</u>, 393 So. 2d 1368, 1370 (Ala. 1981)." <u>Reed</u>, 28 So. 3d at 8.

As previously noted, whether to hold a party in contempt is left to the trial court's discretion, and this court will not reverse a trial court's decision regarding whether a party is in contempt unless it is so unsupported by the evidence as to be plainly and palpably wrong. <u>Nave</u>, 942 So. 2d at 377. Here, the status quo order directed the parties to pay debts and recurring monthly financial obligations such as rent, utilities, groceries, and the like "in the same manner and from the same sources as they have customarily been paid during the marriage." It is undisputed that the wife's actions changed the source of the payment of the Verizon bill. The trial court held the wife in contempt for other violations of the status quo order, and our review of the record reveals no justification for excluding this particular violation from the ones for

47

which the wife was ordered to compensate the husband. We conclude that the evidence does not support the trial court's decision not to hold the wife in contempt for what can only be viewed as the intentional shifting of the responsibility for payment of the Verizon bill to the husband after the entry of the status quo order. See Reed, 28 So. 3d at 8. Therefore, the judgment is revered as to this issue, and on remand, the trial court is directed to enter a judgment consistent with this opinion.

The husband next contends that the wife caused him to incur living expenses higher than those he had had before the entry of the status quo order when, he says, she wrongfully evicted him and locked him out of the marital residence. He seeks $32,210.65 or some portion thereof as compensation for the financial loss he claims he sustained because of the wife's conduct.

The wife's parents owned the marital residence, and they took steps to evict the parties from that house, albeit in a manner that appeared to be contrived between them and the wife, particularly because the wife was never required to leave the residence. The husband does not argue that the wife's parents' conduct violated a lease agreement, and he does not assert that they had no legal basis for evicting him. The status quo

48

order did not prohibit the wife's parents, who were not parties to the divorce action, from determining who they would permit to live on their property, and the trial court properly could have concluded that their action in evicting the husband did not constitute a violation of the status quo order by the wife. Thus, we find no merit in the husband's contention.

<u>Conclusion</u>

For the reasons set forth above, we reverse the judgment insofar as it incorrectly determined the value of the wife's pickup truck and failed to hold the wife in contempt for changing the source of payment for the Verizon bill in violation of the status quo order. In all other respects, we affirm the judgment. We remand the cause to the trial court for it to enter a new judgment consistent with this opinion.

The husband's request for an attorney fee on appeal is denied.

CL-2023-0382 – APPLICATION GRANTED; OPINION OF JULY 26, 2024, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.

Edwards and Hanson, JJ., concur.

Moore, P.J., and Lewis, J., concur in the result, without opinions.

CL-2023-0408 – APPLICATION GRANTED; OPINION OF JULY 26, 2024, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Edwards, Hanson, and Lewis, JJ., concur.

Moore, P.J., concurs in the result, without opinion.